UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SWEET MAMA PRODUCE, LLC, an Illinois Limited Liability Company, ) ) ) | |
| Plaintiff-Stakeholder, ) ) | Case No. 08 C 3792 |
| vs. ) ) | Judge Hon. Rebecca R. Pallmeyer |
| WILLIAMSON PRODUCE, INC., a North Carolina Corporation; HENDRIX BROTHERS PRODUCE, INC., a Georgia Corporation; and CNH CAPITAL AMERICA LLC, a Delaware Limited Liability Company, ) ) ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants-Claimants. ) ) | |
| _____ ) | |
| CNH CAPITAL AMERICA, LLC, a Delaware limited liability company, ) ) ) | |
| Counter-Plaintiff and Cross-Plaintiff, ) ) | |
| vs. ) ) | |
| SWEET MAMA PRODUCE, LLC, an Illinois Limited Liability Company, ) ) ) | |
| Counter-Defendant, ) ) | |
| WILLIAMSON PRODUCE, INC., a North Carolina Corporation; HENDRIX BROTHERS PRODUCE, INC., a Georgia Corporation, ) ) ) ) | |
| Cross-Defendants. ) | |

**CNH CAPITAL AMERICA LLC'S**
**ANSWER, COUNTERCLAIM AND CROSSCLAIM FOR DECLARATORY RELIEF**

Now Comes Defendant-Claimant, Cross-Plaintiff and Counter-Plaintiff, CNH CAPITAL

AMERICA LLC, by its attorneys, Clark Hill, and as its Answer to Plaintiff's First Amended

Complaint and Counterclaim and Crossclaim against SWEET MAMA PRODUCE, LLC ("Sweet

Mama"), WILLIAMSON PRODUCE, INC. ("Williamson"), and HENDRIX BROTHERS PRODUCE, INC. ("Hendrix"), states as follows:

## ANSWER TO FIRST AMENDED COMPLAINT

### Introduction

1.   Sweet Mama is a produce broker. It agreed to broker the sale of watermelons for Hendrix, which grows watermelons. In the course of brokering sales for Hendrix, Sweet Mama came to possess proceeds that would, ordinarily, be due to Hendrix as payment for the Hendrix watermelons that Sweet Mama helped to sell. Williamson has made a claim to some of that money, too, however, relying on an exclusive marketing agreement it had with Hendrix, about which Sweet Mama had not been aware. That agreement, if valid, provides that Williamson is entitled to $800 from the sale proceeds for every load of Watermelons that Hendrix sells. Sweet Mama also has learned that Hendrix granted a security interest in Hendrix's crops to it that CNH asserts gives it a priority over Hendrix's or Williamson's claims. Sweet Mama brokered the sale of 117 loads of Hendrix watermelons. Thus, Sweet Mama is in possession of $93,600 ($800 x 117 loads) to which Hendrix, Williamson and CNH all have claims, but concerning which Sweet Mama has no claim. Sweet Mama has filed this Interpleader complaint and will seek an order discharging Sweet Mama from this dispute and allowing it to deposit with the Court the money claimed by Hendrix, Williamson and CNH. The claimants can resolve their competing claims in Court.

**ANSWER:  CNH Capital America LLC ("CNH") admits that it has a first position priority lien and security interest on all farm products, inventory, accounts and receivables of Hendrix Brothers Produce, Inc. ("Hendrix"), including the $93,600 referenced in this Paragraph.  CNH has insufficient information to admit or deny the allegations of this paragraph and demands strict proof thereof.**

### The Parties

2.   Sweet Mama is an Illinois limited liability company in the business of brokering the sales of fresh produce from growers to retailers with its principal place of business at 100 Lexington Drive, Suite 201, Buffalo Grove, Illinois 60089. The members of Sweet Mama are Wilmer Carr Hussey, a citizen of Florida, Paul Nuzzo, a citizen of Massachusetts, and Ruby Robinson Co., Inc., an Illinois corporation with its principal place of business in Illinois.

**ANSWER: CNH admits the allegations of this paragraph.**

3. Hendrix is a Georgia Corporation in the business of growing fresh produce with its principal place of business at 3603 Adabelle Road, Register, Georgia 30452.

**ANSWER: CNH admits the allegations of this paragraph.**

4. Williamson is a North Carolina corporation in the business of wholesaling, packing and shipping fresh produce with its principal place of business at 1501 Ralston Street, Wilson, North Carolina 27895.

**ANSWER: CNH admits the allegations of this paragraph.**

5. CNH is a Delaware limited liability company in the business of financing with its principal place of business at 5729 Washington Avenue, Racine, Wisconsin. CNH is a wholly owned subsidiary of CNH Global N. V., a Netherlands corporation, which accordingly is CNH's only member, and which has its principal place of business at World Trade Center, Amsterdam Airport, Tower B, 10th Floor, Schiphol Boulevard 217, 1118 BH Amsterdam, The Netherlands.

**ANSWER: CNH is a Delaware limited liability company with its principal place of business in Burr Ridge, Illinois. The sole member of CNH is CNH Capital LLC, a Delaware limited liability company with its principal place of business in Racine, Wisconsin. The sole member of CNH Capital LLC is CNH America LLC, a Delaware limited liability company with its principal place of business in Racine, Wisconsin. The sole member of CNH America LLC is Case New Holland, Inc., a Delaware corporation with its principal place of business in Racine ,Wisconsin.**

## Jurisdiction

6. Because Sweet Mama and its members, Williamson, Hendrix and CNH, and CNH's sole member, are each citizens of different states, and the amount in controversy in this matter exceeds $75,000, this Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

**ANSWER: CNH admits the allegations of this Paragraph.**

## Venue

7.      Venue is proper in the Eastern Division of the Northern District of Illinois because a substantial part of the events giving rise to the claimants' competing claims, as set forth below, occurred within this division and district. Moreover, both claimants have reached into the State of Illinois to either do business with Sweet Mama (in the case of Hendrix) or else to lay claim to money held by Sweet Mama in Illinois. *See* 28 U.S.C. § 139I(a)(2) and (3).

**ANSWER: CNH admits the allegations of this Paragraph.**

**Facts**

8.      Beginning in or about May 2008, Sweet Mama agreed with Hendrix to broker the sale of watermelons grown by Hendrix in exchange for a brokerage fee. This meant that Sweet Mama would find buyers for Hendrix watermelons and would broker those sales. The buyers would pay Sweet Mama. Sweet Mama would then pay Hendrix for the watermelons, subject to Sweet Mama's brokerage fee, transportation costs, adjustments for any rejected loads and the like.

**ANSWER: CNH has insufficient information to admit or deny the allegations of this paragraph.**

9.      Pursuant to its agreement with Hendrix, Sweet Mama brokered the sale of a total of 117 loads of Hendrix watermelons.

**ANSWER: CNH has insufficient information to admit or deny the allegations of this paragraph.**

10.     On or about June 14, 2008, Sweet Mama received a notification from R. Williamson of Williamson that Williamson had previously entered into an exclusive marketing agreement (the "Marketing Agreement"). Williamson asserted that Hendrix's sales of watermelons through Sweet Mama were in violation of the Marketing Agreement. Williamson provided a copy of the Marketing Agreement to Sweet Mama and the Marketing Agreement does provide for Williamson to be paid a commission of "$800 per load, to be deducted from the sales proceeds" for every load of Hendrix watermelons sold. Williamson's letter was the first that Sweet Mama had heard of the Marketing Agreement.

**ANSWER: CNH has insufficient information to admit or deny the allegations of this paragraph.**

11.     After receiving Williamson's letter, Sweet Mama contacted Hendrix to inquire as to the validity of Williamson's claim. Hendrix stated that Williamson was in breach of the Marketing Agreement and that, accordingly, Hendrix considered that agreement to be null and

void.

**ANSWER: CNH has insufficient information to admit or deny the allegations of this paragraph.**

12.     Subsequent to these initial contacts, Hendrix has made demands to Sweet Mama for all the net proceeds owed to Hendrix from the sales of Hendrix watermelons brokered by Sweet Mama. Williamson has made demands for those same funds. Although Williamson asserts additional claims against Hendrix, with regard to specific amounts owed to Williamson that were to be deducted from the sale of Hendrix watermelons, Williamson has identified only the $800 per load amount specified in the Marketing Agreement. Williamson has also threatened to sue Sweet Mama for these proceeds and has further threatened that, unless Sweet Mama turns over to either Williamson or the Court amounts well in excess of the $800 per load that the Marketing Agreement provides, Williamson will contact Sweet Mama's customers and suggest that Sweet Mama is somehow in collusion with Hendrix to the detriment of Williamson or even to suggest that Sweet Mama lacked title to the watermelons that it sold because of Williamson's claim against Hendrix.

**ANSWER: CNH has insufficient information to admit or deny the allegations of this paragraph.**

13.     On June 25, 2008, CNH gave Sweet Mama notice of its security interest in Hendrix's watermelon crop, which CNH claims gives it a superior claim to all or part of the money at issue. CNH stated that "[d]emand is hereby made upon you if the Debtor [Hendrix] sells at your facility. Any check payable for any crops shall be made payable jointly to the Debtor and to CNN Capital." Sweet Mama has previously been aware of CNH's interest in the Hendrix crop.

**ANSWER: CNH admits the allegations of this paragraph 13.**

14.     Sweet Mama takes no position in the dispute between Hendrix and Williamson. In fact, Sweet Mama is in doubt as to which of Hendrix or Williamson has the superior claim to the proceeds that Sweet Mama holds in the amount of $93,600 ($800 x 117 loads). Similarly, Sweet Mama takes no position as to priority of the security interest of CNH.

**ANSWER: CNH admits the allegations of this Paragraph.**

**COUNTERCLAIM AND CROSSCLAIM OF CNH CAPITAL AMERICA LLC**

Now Comes Defendant-Claimant, Cross-Plaintiff and Counter-Plaintiff, CNH CAPITAL AMERICA LLC, by its attorneys, Clark Hill, and as its Counterclaim and Crossclaim against SWEET MAMA PRODUCE, LLC ("Sweet Mama"), WILLIAMSON PRODUCE, INC. ("Williamson"), and HENDRIX BROTHERS PRODUCE, INC. ("Hendrix"), states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.  CNH Capital America LLC ("CNH") is a Delaware limited liability company with its principal place of business in Burr Ridge, Illinois. The sole member of CNH is CNH Capital LLC, a Delaware limited liability company with its principal place of business in Racine, Wisconsin. The sole member of CNH Capital LLC is CNH America LLC, a Delaware limited liability company with its principal place of business in Racine, Wisconsin. The sole member of CNH America LLC is Case New Holland, Inc., a Delaware corporation with its principal place of business in Racine ,Wisconsin.

2.  Sweet Mama Produce LLC. ("Sweet Mama") is an Illinois limited liability company with its principal place of business at 100 Lexington Drive, Suite 201, Buffalo Grove, Illinois 60089. The members of Sweet Mama are Wilmer Carr Hussey, a citizen of Florida, Paul Nuzzo, a citizen of Massachusetts, and Ruby Robinson Co., Inc., an Illinois corporation with its principal place of business in Illinois.

3.  Hendrix Brothers Produce, Inc. ("Hendrix") is a Georgia Corporation with its principal place of business at 3603 Adabelle Road, Register, Georgia 30452.

4.  Williamson Produce, Inc. ("Williamson") is a North Carolina corporation with its principal place of business at 1501 Ralston Street, Wilson, North Carolina 27895.

5.	Jurisdiction of this action is proper because Plaintiff Sweet Mama, a limited liability company, has members whom are all citizens of different states than Defendants CNH Capital, Williamson and Hendrix, and the amount in controversy in this matter exceeds $75,000 pursuant to 28 U.S.C. § 1332.  Likewise, if Sweet Mama is dismissed from this action after depositing the Proceeds with this Court, CNH is a limited liability company with members whom are all citizens of different states than all other Defendants hereto and the amount in controversy exceeds $75,000.

6.	Venue is proper in the Eastern Division of the Northern District of Illinois because a substantial part of the events giving rise to the Sweet Mama's First Amended Complaint in Intervention occurred within this district pursuant to 28 U.S.C. § 1391(a)(2).

**COUNT I: DECLARATORY JUDGMENT**

7.	On or about March 12, 2008, Hendrix entered into a Line of Credit and Security Agreement with Growers Supply, Inc. ("GSI").  A true and correct copy of the Line of Credit and Security Agreement is attached hereto as Exhibit 1.

8.	Pursuant to the terms of the Line of Credit and Security Agreement, in exchange for the extension of credit and other financial consideration provided by GSI, Hendrix granted to GSI a security interest in all of its inventory, farm products including crops grown, accounts, agreements and all other forms of obligations or receivables (collectively, the "Secured Assets:").  See, Exhibit 1, ¶ 3.

9.	On or about March 12, 2008, GSI assigned all of its right title and interest in the Line of Credit and Security Agreement, including the Secured Assets, to CNH.  A true and

correct copy of the Assignment is attached hereto and included in Exhibit 1.

10. On or about April 11, 2007, CNH filed a UCC-1 financing statement with the Secretary of State of Georgia perfecting CNH's security interest in all assets of Hendrix as identified in the UCC-1 financing statement, including the Secured Assets. A true and correct copy of the UCC-1 financing Statement is attached hereto as Exhibit 2.

11. Upon information and belief, beginning in or before May 2008, Sweet Mama brokered the sale of watermelons grown and produced by Hendrix.

12. Upon information and belief, Sweet Mama is currently in possession of $93,600, representing portions of the sales proceeds for watermelons grown by Hendrix (the "Proceeds") and paid by the purchasers of the watermelons.

13. Pursuant to the Line of Credit and Security Agreement, CNH has a first position priority interest in the crops and accounts receivable of Hendrix, including the Proceeds.

14. Williamson does not have a statutory or common law lien or right to the Proceeds.

15. Currently, Hendrix owes $9,612,573.27 to CNH pursuant to the Line of Credit and Security Agreement.

16. CNH has an immediate right to turnover of the Proceeds for application to the outstanding balance on the Line of Credit and Security Agreement.

17. CNH seeks a declaration from this Court that CNH maintains a first position priority security interest in the Proceeds, that CNH's rights to the Proceeds are superior to all other parties to this action, and that the Proceeds will be tendered to CNH by either Sweet Mama

or the Court if the Proceeds have been deposited with the Court.

18. There is an actual controversy between the parties related to the enforcement of CNH's security interest and the right to the Proceeds which requires adjudication and resolution by this Court.

WHEREFORE, CNH CAPITAL AMERICA LLC, respectfully requests this Court enter a declaratory judgment for and against all Parties hereto as follows:

(a) finding that CNH Capital America LLC holds a first position priority security interest in the Proceeds held by Sweet Mama Produce, Inc. and/or deposited by Sweet Mama Produce Inc. with this Court;

(b) finding that CNH Capital America LLC right to the Proceeds identified herein are superior to all other Parties to this action;

(c) ordering that the Proceeds identified herein be paid to CNH Capital America LLC; and

(d) any further legal or equitable relied this Court deems just.

August 6, 2008

        Respectfully submitted,

        CNH CAPITAL AMERICA LLC

        By:   s/W. Kent Carter
               One of its Attorneys

W. Kent Carter, Esq.(wcarter@clarkhill.com)
Jessica Scheller, Esq.(jscheller@clarkhill.com)
Clark Hill
150 N. Michigan Avenue, Suite 2400
Chicago, IL  60601
Tel.:(312) 985-5900
Fax:(312) 985-5999

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| SWEET MAMA PRODUCE, LLC, an Illinois Limited Liability Company, ) ) ) | |
| Plaintiff-Stakeholder, ) ) | Case No. 08 C 3792 |
| vs. ) ) | Judge Hon. Rebecca R. Pallmeyer |
| WILLIAMSON PRODUCE, INC., a North Carolina Corporation; HENDRIX BROTHERS PRODUCE, INC., a Georgia Corporation; and CNH CAPITAL AMERICA LLC, a Delaware Limited Liability Company, ) ) ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants-Claimants. ) ) | |
| CNH CAPITAL AMERICA, LLC, a Delaware limited liability company, ) ) ) | |
| Counter-Plaintiff and Cross-Plaintiff, ) ) | |
| vs. ) ) | |
| SWEET MAMA PRODUCE, LLC, an Illinois Limited Liability Company, ) ) ) | |
| Counter-Defendant, ) ) | |
| WILLIAMSON PRODUCE, INC., a North Carolina Corporation; HENDRIX BROTHERS PRODUCE, INC., a Georgia Corporation, ) ) ) ) | |
| Cross-Defendants. ) | |

**EXHIBITS TO CNH CAPITAL AMERICA LLC'S ANSWER, COUNTER-CLAIM AND CROSS-CLAIM FOR DECLARATORY RELIEF**

# EXHIBIT 1

5631091.1 28265/123770

## IH Capital *Ag Resource Plus*<sup>SM</sup>
## LINE OF CREDIT AND SECURITY AGREEMENT

THIS LINE OF CREDIT AND SECURITY AGREEMENT, dated March 12, 2008 (the "Agreement") is made by and between Growers Supply, Inc. (hereinafter referred to as "Company") and the party or parties signing under the caption "Debtors" below (all such parties, whether one or more than one, are hereinafter collectively referred to as "Debtor") as follows:

**1. PRINCIPAL AND INTEREST OBLIGATIONS: PAYMENTS:** Debtor hereby promises to pay "Lender" (which shall mean Company, or, upon assignment of Company's rights and interests hereunder, shall mean CNH Capital (as defined in Section 19 below) or any subsequent assignee of such rights and interests) as follows:

(a) **PRINCIPAL:** The maximum intended principal amount outstanding at any time hereunder of Ten Million Seven Hundred Twenty Thousand Dollars ($10,720,000.00) (which includes a sum of $250.00 paid by Debtor as an administrative fee for processing the extension of credit to Debtor and for paying fees incurred in connection with the perfection of the security interest in the Collateral (as herein defined) granted herein by Debtor). The actual principal indebtedness outstanding from time to time hereunder shall be the sum of all advances made to or for the benefit of Debtor hereunder, reduced by payments applied to principal as provided hereunder, all as reflected in the books and records of Lender. Debtor agrees that, absent manifest error, such books and records shall be deemed conclusive evidence of Debtor's principal obligations hereunder unless Debtor shall object in writing within fifteen (15) days of receipt of any periodic or other statement from Lender setting forth such principal indebtedness. Lender, in its sole discretion and upon written notice to the Debtor, may reduce the aggregate principal amount to be advanced and/or the principal sum permitted to be outstanding from time to time under this Agreement.

(b) **INTEREST:** Accrued interest on the principal amount from time to time outstanding hereunder will be calculated as follows:

(i) Interest shall be calculated at the following annual rate selected by you:

(1) ☒ A rate not to exceed 1.75% in excess of the prime or base rate reported from time to time in the "Money Rates" section of The Wall Street Journal or any similar successor section (the "Prime Rate"), but not more than the highest rate permitted by law. The Prime Rate for a given date shall mean the Prime Rate published on the business day immediately prior to such date. If The Wall Street Journal ceases publication permanently or no longer publishes the above-referenced prime rate, then "Prime Rate" shall mean the prime loan rate of any federally chartered bank selected by Lender. The Prime Rate may be adjusted daily. The actual rate of interest applied to the principal amount may be less than the rate described in this Section 1(b)(i)(1) as a result of, among other things, promotions offered by the Company. The actual rate being applied to the principal amount outstanding from time to time will be reflected in the periodic statements issued by Lender; or

(2) ☐ _____ percent ( ____ %) per annum fixed.

(ii) Except as prohibited by law, thirty days (30) after the occurrence of an event of default, as described below, a default rate of interest equal to the sum of the rate of interest set forth in Section 1(b)(i) plus an additional five percent (5%) shall be in effect until the default has been cured.

(iii) Interest shall accrue daily on the principal amount from time to time outstanding on the basis of a year comprised of 365/366 days.

(c) **PAYMENT SCHEDULE; APPLICATION OF PAYMENTS:** Principal, accrued interest and all other amounts due hereunder shall be due and payable as follows:

(i) Any and all proceeds of Collateral shall be delivered, in kind, to Lender (as directed by Lender), such delivery to be made within five (5) business days of any sale or other disposition of such Collateral.

(ii) Debtor shall be obligated to make the following principal payments on the following date(s) (each a "Principal Payment Date"), not to exceed on any Principal Payment Date the aggregate principal amount outstanding on such date:

| Principal Payment Date | Amount |
|---|---|
| 9/1/2008 | $820,000.00 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

and a final principal payment equal to the entire principal balance then outstanding on March 1, 2009 (also a "Principal Payment Date" and the "Final Maturity Date").

(iii) Accrued interest will be billed to the Debtor and be due and payable on each Principal Payment Date. On the Final Maturity Date, all accrued interest through the Final Maturity Date will be due and payable.

(iv) Proceeds of Collateral paid to Lender by or on behalf of Debtor and any other payment made by Debtor, in either case more than twenty-five (25) days prior to a Principal Payment Date, will be applied first to reduce the then outstanding principal amount hereunder (with any excess applied to any then outstanding fees, costs, charges, interest or other amounts as Lender, in its discretion, may determine). All proceeds of Collateral paid to Lender and any other payment made by Debtor, within twenty-five (25) days prior to or on a Principal Payment Date (or after a Principal Payment Date in the event full payment is not made on or before that Principal Payment Date) will be applied to outstanding items in the following order: fees, costs, charges, interest and principal. Amounts applied to outstanding principal under the preceding sentences will be applied to principal payments due on Principal Payment Dates in order of their maturity.

**2. REIMBURSEMENT OF EXPENSES:** Debtor hereby agrees to reimburse Lender for all UCC and other filing, recording, and lien search fees reasonably incurred in connection herewith. All reimbursable expenses, including, without limitation, expenses incurred in connection with the exercise of Lender's remedies following an Event of Default, shall be considered advances hereunder, shall be added to the principal indebtedness hereunder and shall be payable on demand. Debtor further agrees that if a check is returned for any reason, Lender may charge Debtor a returned check processing fee as established by Lender from time to time, not to exceed the maximum permitted under applicable law.

**3. GRANT OF SECURITY INTEREST; COLLATERAL:** To secure payment and performance of the Debtor's present and future obligations and indebtedness under this Agreement, or howsoever otherwise arising, Debtor hereby grants to Lender a security interest in and to all of the following property of Debtor now owned or hereafter acquired: (a) all inventory, including, without limitation, all raw materials, work in process, or materials used or consumed in Debtor's farming operation; (b) all equipment and other goods wherever located, of whatever kind, make, model, brand or nature together with all trade-ins, accessions and rights relating to, and all proceeds thereof; (c) all farm products which include, but are not limited to, all crops grown, growing, or to be grown, including crops produced on

## NH Capital *Ag Resource Plus*<sup>SM</sup>
## LINE OF CREDIT AND SECURITY AGREEMENT

trees, vines and bushes as well as aquatic goods produced in aquacultural operations; (ii) all livestock, born or unborn, including, but not limited to, aquatic goods produced in aquacultural operations; (iii) all supplies used in the Debtor's farming operations, including, but not limited to, all seed, fertilizer, feed, medicines, harvested and stored crops, milk and other supplies or products used or produced; and (iv) all products of crops or livestock in their unmanufactured states; (d) all accounts, general intangibles, chattel paper, leases, instruments, documents, agreements, drafts, acceptances, milk contract rights, and all other forms of obligations or receivables and all bills of lading, dock warrants and receipts, warehouse receipts, and any other document; (e) any other or additional assets of Debtor in which Debtor may have heretofore granted or may hereafter grant Lender a security interest; and (f) all proceeds of any or all of the foregoing, including, without limitation, insurance proceeds (individually and collectively, the "Collateral"). All terms used in the preceding sentence which are defined in the Uniform Commercial Code ("UCC") shall have the meaning ascribed to them therein.

4. **COVENANTS:** Debtor covenants and agrees that so long as this Agreement is in effect and until payment and performance in full of all obligations and indebtedness arising hereunder, unless Lender shall otherwise give its prior written consent, Debtor shall perform and comply with all covenants in this Section 4.

(a) <u>No Liens</u>. Debtor shall not directly or indirectly create, incur, assume or permit to exist any lien on or with respect to any Collateral, including any document or instrument with respect to goods or accounts receivable of Debtor, whether now owned or hereafter acquired, or any income, proceeds or profits therefrom, except as granted herein.

(b) <u>Maintenance of Collateral</u>. Debtor hereby agrees that it shall maintain or cause to be maintained in good repair, working order and condition all Collateral used in the Debtor's farming operations and will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(c) <u>Insurance</u>. Debtor hereby agrees that it shall maintain or cause to be maintained, with a financially sound and reputable insurer(s), liability and property damage insurance with respect to the Collateral against loss or damage of the kinds customarily carried or maintained by persons of established reputation engaged in similar businesses and in amounts acceptable to Lender and will deliver evidence thereof to Lender. All such policies of insurance shall include endorsements naming Lender as additional insured or loss payee in form and substance acceptable to Lender.

(d) <u>Inspection of Collateral</u>. Debtor hereby authorizes and agrees that it shall permit any authorized representatives of Company or Lender to visit and inspect any of the Collateral, together with its financial, banking and accounting records, and to make copies and take extracts therefrom, and to discuss Debtor's affairs, finances and business with the Company and Debtor's officers, employees, agents and certified public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested.

(e) <u>Other Documents and Actions</u>. Debtor will, from time to time, at its expense, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable, or that Lender may request, in order to create, perfect and protect any security interests granted or purported to be granted hereby or pursuant to any other document or to enable Lender to exercise and enforce its rights and remedies hereunder, or under any other document with respect to any Collateral.

(f) <u>Corporate or Name Change</u>. Debtor shall provide Lender no less than thirty (30) days written notice prior to any change in Debtor's name, identity, mailing address or corporate structure. With respect to any such change, Debtor will promptly execute and deliver such documents and take such actions as Lender deems necessary or desirable to create, perfect and preserve the security interests of Lender in the Collateral.

(g) <u>Business and Collateral Locations</u>. Subject to the next sentence, Debtor shall keep the Collateral at the locations specified on Schedule I. Debtor shall provide Lender no less than thirty (30) days written notice prior to any change in Debtor's chief executive office and principal place of business or of any new location of business or of any new location for any of the Collateral. With respect to any new location (which in any event shall be within the continental United States), Debtor will execute such documents and take such actions as Lender deems necessary to further perfect and preserve Lender's security interest in the Collateral.

5. **FINANCING STATEMENT:** Debtor hereby authorizes the filing of such financing statement(s) and any other such documents as Lender may deem necessary or desirable to perfect the security interest in Collateral granted under this Agreement. Debtor further agrees to execute such other documents and provide such information as Lender may deem necessary for Lender to perfect its security interest against the Collateral and any proceeds thereof, including, without limitation, any and all insurance proceeds.

6. **SALE OF COLLATERAL:** Unless otherwise agreed by Lender in writing, Debtor may only sell, transfer or otherwise dispose of Collateral as provided in Schedule I. Lender may, at its sole discretion, notify potential purchasers of the Collateral of the existence of this Agreement and the security interests granted hereunder and require that such potential purchasers issue payment for any Collateral jointly in the name of both Debtor and Lender.

7. **ADVANCES:** Debtor authorizes advances under this Agreement to be applied directly to Debtor's open account at Company without further direction by Debtor. From time to time Debtor may also request that advances be disbursed to Debtor or other third parties. Amounts will be deemed advanced hereunder as of the date(s) indicated by the books and records of Lender. Advances hereunder may be made until the final billing statement hereunder is generated or until the total of all amounts so advanced equals the face amount of the Agreement contained herein. If the advance requested would cause the total of all amounts advanced to exceed the face amount of the Agreement contained herein, at Lender's discretion, the requested advance shall be deemed reduced to an amount that, when added to the amounts previously advanced hereunder, equals the maximum amount allowed under this Agreement. All advances are at the Lender's sole discretion. Debtor may not reborrow amounts paid hereunder.

8. **DEFAULT:** Debtor will be in default under this Agreement (each an "Event of Default") if: (a) Debtor fails to perform or observe any term, covenant or agreement contained in this Agreement, or in any other agreement between Lender and Debtor; (b) Debtor fails to pay any obligation to Lender when due and payable hereunder, under any other present or future agreement between CNH Capital and Debtor or otherwise arising; (c) Debtor sells, leases, otherwise disposes of or encumbers any Collateral in a manner not permitted under this Agreement; (d) Debtor, if a sole proprietorship, or any individual guarantor of Debtor's obligations to Lender dies or becomes incapacitated, or any guarantor notifies Lender of its intent to terminate, or terminates its guaranty, or otherwise breaches any terms contained in any guaranty or other agreement between the guarantor and Lender or its assigns; (e) any representation, warranty, financial statement, report or certificate that Debtor or any guarantor makes or delivers to Lender is not accurate in all material respects, or is materially misleading, when made; (f) Debtor abandons any Collateral or fails to plant, cultivate and harvest crops in accordance to normally accepted agricultural methods, or to properly care for or protect any of the Collateral; (g) an attachment, sale or seizure issues or is executed against any assets of Debtor or of any guarantor; (h) Debtor or any guarantor ceases existence as a corporation, partnership, limited liability company or trust, as applicable; (i) Debtor or any guarantor ceases or suspends business; (j) Debtor or any guarantor makes a general assignment for the benefit of creditors; (k) any bankruptcy, insolvency arrangement, reorganization, receivership or similar proceedings is commenced by or against Debtor or any guarantor under any state or federal law; (l) Debtor or any guarantor becomes insolvent; (m) any receiver or trustee is appointed for any assets of

## CNH Capital *Ag Resource Plus*<sup>SM</sup>
## LINE OF CREDIT AND SECURITY AGREEMENT

Debtor or any guarantor; or (n) Lender determines in good faith that it is insecure with respect to any of the Collateral or the payment in full of Debtor's obligations.

**9. REMEDIES:** Upon the occurrence of an Event of Default, Lender at any time, without notice or demand to Debtor, shall be permitted to do any one or more of the following: (a) declare all or any part of the obligations hereunder immediately due and payable; (b) exercise any rights it may have under the UCC or other applicable law; (c) cease extending additional credit to Debtor; (d) without notice or demand to Debtor, take immediate and exclusive possession of the Collateral wherever located and enter any of the premises of Debtor, with or without process of law, wherever the Collateral may be and take possession of and remove the Collateral, all without liability on the part of Lender. To the extent permitted by applicable law, Debtor shall pay, upon demand, all expenses reasonably incurred by Lender in collecting the indebtedness, including but not limited to, reasonable attorney fees, whether or not suit is filed with respect thereto, court costs, all expenses of taking possession, holding, preparing for disposition and disposing of the Collateral, and other reasonable related expenses. All of Lender's rights and remedies are cumulative and non-exclusive. Lender's failure to exercise any of Lender's rights or remedies hereunder will not waive any of Lender's rights or remedies as to any past, current or future default.

**10. POWER OF ATTORNEY:** Debtor authorizes Lender, and does hereby make, constitute and appoint Lender and its respective officers, agents, successors or assigns with full power of substitution, as such Debtor's true and lawful attorney-in-fact, with power, in the name of the Lender or such Debtor, to (a) endorse any note, checks, drafts, money orders or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of Lender or its assign; (b) to sign and endorse any financing statement pursuant to the UCC or any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts; and other documents relating to the Collateral; (c) to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) cause the sale of any accounts pursuant to this Agreement; and (f) generally, at the option of Lender, and at the expense of the Debtor, at any time, or from time to time, to execute and deliver any and all documents and instruments and to do all acts and things which Lender deems necessary to protect, preserve and realize upon the Collateral and the security interest granted herein in order to effect the intent of this Agreement as fully and effectually as Debtor might or could do. Debtor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof and Lender shall not be liable for any act or omission or for error of judgment or mistake of fact or law. Such irrevocable power of attorney shall not be affected by any subsequent disability, incapacity or incompetence of the Debtor.

**11. WAIVER:** No failure or delay on the part of Lender to exercise, or any partial exercise of, any power, right, or privilege hereunder shall impair such power, right, or privilege or be construed to be a waiver of any default or Event of Default. All rights and remedies existing hereunder or under any other loan document are cumulative to and not exclusive of any rights or remedies otherwise available. All waivers must be in writing. Debtor hereby authorizes and waives any demand by Lender, presentment for payment, and notice of dishonor as to all commercial paper at any time upon which Debtor is in any way liable. Debtor further authorizes and waives any notice of nonpayment at maturity of any and all obligations, notice of all action taken by Lender. Further, Debtor hereby consents to the release, compromise, settlement, extension, and renewal of any indebtedness and/or the Collateral.

**12. RELEASE:** Debtor hereby forever releases Lender from all claims for loss or damage caused by any failure to collect or enforce any obligations, or caused by any act or omission on the part of Lender, its officers, agents or employees; provided, however, such release shall not extend to any of same arising from Lender's willful misconduct. To the extent that Lender collects any interest that is deemed to be in excess of the maximum interest permitted under applicable law, Lender agrees to apply such excess to reduce the principal amount under this Agreement so that the total interest actually paid by Debtor shall not exceed the maximum amount that may be lawfully collected.

**13. NOTICE:** Any notice required or contemplated by any term or provision of this Agreement shall be deemed to have been given when mailed, with first-class postage fully prepaid, to Debtor at the address(es) specified below or at such other address of Debtor as may from time to time be shown on Lender's records. Notices shall be addressed as set forth and in accordance with Schedule I.

**14. SEVERABILITY:** Any part of this Agreement which is held to be invalid or unenforceable under applicable law shall be enforceable to the maximum extent permitted by law, without invalidating its effect elsewhere or the remainder of this Agreement.

**15. MISCELLANEOUS:** The headings of the several paragraphs hereof are for convenience only and shall not be construed as part of the Agreement.

**16. ENTIRE AGREEMENT:** This Agreement, the CNH Capital *Ag Resource*<sup>SM</sup> Credit Application, the guaranty (if any) and extensions thereof embody the final, entire agreement among the parties hereto and supersede any and all prior commitments, agreements, representations, understandings, whether oral or written, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral agreements or discussions of the parties hereto.

**17. INTERPRETATION:** The validity, construction and enforcement of the Agreement are governed by the internal laws of the state in which the Company is located as provided above. All terms used herein and not otherwise defined shall have the meanings assigned to them by the UCC.

**18. STATUTORY WAIVERS:** To the fullest extent permitted by law, each Debtor waives all of the rights, benefits and protections given by the provisions of any existing or future statute which imposes limitations upon the powers, rights or remedies of Lender hereunder or upon the methods of realization of security including any seize-or-sue or any anti-deficiency statute or any similar provisions of any other statute.

**19. ASSIGNMENT:** It is anticipated that this Agreement will be assigned to CNH Capital America LLC, or, in Canada, CNH Capital Canada Ltd. (herein individually and collectively referred to as "CNH Capital"), and that Debtor will pay CNH Capital directly. Debtor and Company each consent to the Agreement being assigned to CNH Capital. Upon CNH Capital's agreement to accept assignment of the Agreement, Company will immediately assign this Agreement to CNH Capital without notice to the Debtor. Debtor waives any and all rights to assert any claims, defenses, counterclaims, rights of set-off or recoupment of any kind it may now or hereafter hold with respect to the Company against CNH Capital or any subsequent assignee. Upon assignment, all extensions of credit by Company to Debtor based on this Agreement shall nevertheless continue to be covered by the Agreement. Unless otherwise set forth in a written agreement by and between the Debtor, CNH Capital and Company, Debtor shall make all payments due and owing hereunder directly to CNH Capital or CNH Capital's assignee. CNH Capital may reassign or sell the Agreement without notice to Debtor. Each assignee shall have all of the rights, but none of the obligations, of Company under this Agreement. Debtor may not assign this Agreement or any of its rights or obligations hereunder by operation of law or otherwise without the prior written consent to Lender. Subject to the foregoing, this Agreement shall inure to the benefit of and is binding upon the legal representatives, assigns, and successors of the parties hereto.

51666R Rev. 01/07 Previous editions may not be used (W)  *initials*  DB
Page 3 of 6

Initials _BW__  Initials _____  Initials _____
Initials _____  Initials _____  Initials _____

NH Capital *Ag Resource Plus*<sup>SM</sup>
LINE OF CREDIT AND SECURITY AGREEMENT

## NOTICE

(A) DO NOT EXECUTE THIS AGREEMENT UNTIL YOU HAVE READ EACH AND EVERY TERM OF THIS AGREEMENT OR IF THE AGREEMENT CONTAINS ANY OMISSIONS. THIS DOCUMENT REPRESENTS THE ENTIRE AGREEMENT. ANY PROVISION NOT INCLUDED IN THE AGREEMENT MAY NOT BE ENFORCED. THE PARTIES MAY VARY THE TERMS HEREIN ONLY THROUGH WRITTEN AGREEMENT.

(B) YOU ARE ENTITLED TO RECEIVE AN EXACT COPY OF THE AGREEMENT.

(C) ANY CO-SIGNOR OR GUARANTOR OF THIS AGREEMENT SHALL BE JOINTLY AND SEVERALLY LIABLE FOR ALL INDEBTEDNESS OF DEBTOR UNDER THE AGREEMENT.

**INDIVIDUAL DEBTOR(S):**

DEBTOR: _[signature]_
Brandon Cole Hendrix
[PRINT NAME OF INDIVIDUAL DEBTOR]

DEBTOR: _[signature]_
Timothy Kevin Hendrix
[PRINT NAME OF INDIVIDUAL DEBTOR]

DEBTOR: _[signature]_
Lynn Hendrix
[PRINT NAME OF INDIVIDUAL DEBTOR]

DEBTOR: _[signature]_
Thomas Greg Hendrix
[PRINT NAME OF INDIVIDUAL DEBTOR]

DEBTOR: _[signature]_
Thomas Gary Hendrix
[PRINT NAME OF INDIVIDUAL DEBTOR]

**COMPANY:** Growers Supply, Inc.
By: _[signature] BT Wood_
Print Name: Brian T. Wood
Its: Secretary

**BUSINESS ENTITY DEBTOR(S):**

DEBTOR: Hendrix Brothers Produce, Inc.
[PRINT NAME OF BUSINESS ENTITY]
By: _[signature]_
Print Name: Cole Hendrix
Its:

DEBTOR: Pulaski Farms, LLC
[PRINT NAME OF BUSINESS ENTITY]
By: _[signature]_
Print Name: Brandon Cole Hendrix
Its:

By: _[signature] Martha Wynelle Murray_
Print Name:
Its:
Witness _[signature] Dale Bennett_

**GUARANTY:**

The undersigned guarantor(s) hereby personally, jointly, severally, absolutely and unconditionally guarantee(s) payment and performance of all Debtor's obligations due and owing under the Agreement, and all modifications and extensions thereof, including, without limitation prompt payment of any and all sums due and owing under the Agreement. To the extent Louisiana law is applicable, the obligations of the undersigned guarantor(s) are *in solido* with the obligations of Debtor. The undersigned hereby waive(s) notice of any modifications, amendments, or extensions of the Agreement, and of Debtor's nonperformance or breach of the Agreement. The payment obligations under this Guaranty are direct, primary, absolute, unconditional, and continuing obligations of the undersigned and the successors, heirs and assignees of the undersigned, and not merely a guaranty of collection. The undersigned hereby acknowledge(s) and agree(s) that the Lender shall not be required to proceed against the Debtor or any collateral securing the Debtor's obligations before proceeding against the undersigned. The undersigned further acknowledge(s) and agree(s) that the undersigned has read and agree(s) with all of the terms and conditions of this Agreement.

● GUARANTOR: _[signature] Martha Wynelle Murray_     GUARANTOR: _____

Print name, address and phone number of each guarantor: Martha Wynelle Murray 3603 Adabelle Broad Register, GA 30452

51866R Rev. 01/07 Previous editions may not be used  Witness _[initials]_   Initials BCH   Initials _[initials]_   Initials _[initials]_
Page 4 of 6                                                                Initials _[initials]_   Initials _[initials]_   Initials _[initials]_

## NH Capital *Ag Resource Plus*<sup>SM</sup>
## LINE OF CREDIT AND SECURITY AGREEMENT

## ASSIGNMENT

FOR VALUE RECEIVED, Company hereby assigns all its right, title and interest in and to the Agreement and all other related documents to CNH Capital America LLC, or in Canada, CNH Capital Canada Ltd. (hereinafter individually and collectively "CNH Capital"), pursuant to the terms and conditions set forth below and the terms and conditions set forth in the various agreements by and between Company and CNH Capital.

Company warrants and represents as follows: (a) all statements contained in the Agreement are true and correct; (b) the Agreement is a valid and binding obligation arising out of a bona-fide obligation in the ordinary course of business and is fully enforceable according to its terms; (c) the Collateral is owned by Debtor; (d) Company made all disclosures required by law, and in the manner required by law prior to Debtor's execution of the relevant document(s); (e) Debtor is not a minor and has the capacity to contract; (f) except as otherwise agreed by CNH Capital in writing, Company has obtained, or caused to be obtained, a properly perfected first priority security interest (or, in Quebec, a first ranking movable hypothec) in the Collateral or has delivered the title, or caused the title to be delivered, to CNH Capital or noted, or caused to be noted, CNH Capital's lien on the title to the Collateral, whichever applies; (g) as of the date of the Agreement, Company has verified and obtained valid proof that the Debtor has obtained insurance which covers any loss, theft, damage or harm to the Collateral and properly nominates CNH Capital as a loss payee on any such policy of insurance; (h) Company has a properly completed and signed credit application from Debtor in accordance with Company's other agreements with CNH Capital; (i) each party constituting Debtor and/or guarantor has both the legal authority and body corporate or individual power to execute the Agreement and to perform its obligations thereunder; (j) the Agreement and Company's rights thereunder are transferred to CNH Capital free and clear of any and all liens, claims, security interests or encumbrances of any kind or nature; (k) Company is (and at all times will be) solvent and operating in the ordinary course of business; (l) the Agreement is not subject to any defense, counterclaim or setoff (or compensation in Quebec), except to the extent enforceability may be limited by bankruptcy, receivership, insolvency or moratorium laws, or by other similar laws of general application; and (m) the Agreement complies with all applicable state, provincial and federal laws.

Company hereby unconditionally agrees to purchase the Agreement from CNH Capital upon demand for the full amount then unpaid whether the Agreement shall then be, or not be, in default, if any of the foregoing representations and warranties is false or if Debtor or any other person makes a claim against CNH Capital alleging facts that could constitute a breach of any of the foregoing representations and warranties. Company shall assume the defense of such claims and shall indemnify and hold CNH Capital harmless from all loss, cost and expense arising therefrom.

The liability of the Company, shall not be affected by any extension, renewal, or other change in the time of the payment of the Agreement, nor any change in the manner, place or terms of the payment thereof, nor the release of, nor settlement or compromise with any party liable for the payment thereof or the release or non-perfection of any security thereunder. CNH Capital shall not be bound to exhaust its recourse against Debtor or any other person nor any security CNH Capital may at any time have, before being entitled to payment from Company hereunder. Company waives notice of the acceptance of this Assignment and notices of non-payment and non-performance of the Agreement and any other notices required by the law and waives all setoffs and counterclaims. This Assignment shall become effective upon CNH Capital's acceptance of the Agreement or upon CNH Capital's payment of the purchase price therefor, whichever first occurs. Company grants CNH Capital an irrevocable power of attorney to endorse and/or negotiate on Company's behalf any checks or other instruments which are received by CNH Capital and apply the same against any sum due and owing to CNH Capital.

Company and CNH Capital intend the sale, assignment and transfer of the Agreement by Company to CNH Capital hereunder to be a true sale, and not a loan secured by the grant of a security interest therein. If, notwithstanding the parties' intent, the sale, assignment and transfer is construed to be a loan and not a true sale, Company hereby grants CNH Capital a valid first priority security interest in the Agreement, all supporting obligations and other rights and property related thereto, and all proceeds thereof, to secure all of Company's present and future obligations in connection with the Agreement, or otherwise. Company hereby irrevocably constitutes and appoints CNH Capital as Company's true and lawful attorney with full power of substitution, for Company and in Company's name, place and stead, to demand, collect, receive, receipt for, sue for and compromise the Agreement and rights assigned hereunder.

|  | Growers Supply, Inc. |
|---|---|
|  | (COMPANY) |
| By: | *[signature]* |
| Title: | Secretary |
| Date: | 3-12-08 |

51666R Rev. 01/07 Previous editions may not be used *[initials]*       Initials *[BH]*   Initials *[illegible]*   Initials *[illegible]*
Page 5 of 6                                                            Initials *[illegible]*   Initials *[illegible]*   Initials *[illegible]*

## NH Capital *Ag Resource Plus*<sup>SM</sup>
## LINE OF CREDIT AND SECURITY AGREEMENT

## SCHEDULE I

**A. Locations where Collateral may be produced, stored or located (include name of county or parish):**

| | | |
|---|---|---|
| Candler County, GA | Evans County, GA | Bulloch County, GA |
| Tattnall County, GA | Toombs County, GA | Montgomery County, GA |
| Emanuel County, GA | Treutlen County, GA | |

**B. Permitted Purchasers of Collateral:**

| Name of Purchaser | Purchaser's Address | Collateral | |
|---|---|---|---|
| | | Crop | Livestock |
| Growers Gin And Warehouse | P.O. Box 857 Metter, GA 30439 | Cotton | |
| Candler Gin And Warehouse | | Cotton | |
| Southern States Gin | 264 Gold Kist Rd Statesboro, GA 30458 | Cotton | |
| T.E. Rushing Peanut and Grain | 5225 Harville Rd Statesboro, GA 30458 | Peanuts | |
| Tillman And Deal Peanut | Railroad Street Statesboro, GA 30458 | Peanuts | |
| Palmetto Grain | | Corn, Beans, Wheat | |

**C. Address(es) for Notices:**

**Company:**

Name:  Growers Supply, Inc.
Street Address:  1085 East Lillian
City:  Metter
County or Parish:  Candler
State:  GA    Zip Code:  30439

**Assignee:**

CNH Capital America LLC
233 Lake Avenue
Racine, WI 53403

**Debtor(s):**

Name:  Brandon Cole Hendrix
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Timothy Kevin Hendrix
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Thomas Greg Hendrix
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Lynn Hendrix
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Thomas Gary Hendrix
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Pulaski Farms, LLC
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

Name:  Hendrix Brothers Produce, Inc.
Street Address:  3603 Adabelle Rd
City:  Register
County or Parish:  Bulloch
State:  GA    Zip Code:  30452

**EXHIBIT 2**

5631091.1 28265/123770

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
Diliganz, Inc.    1-800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)
Return To: David Holcomb
900 Old Roswell Lakes Pkwy
Suite 310
Roswell, GA 30076

Filed in: Georgia Central Indexing

CITY#    YEAR    UCC #
033-2007-03622
Filed and Recorded Apr-11-2007 12:42pm

Jay C. Stephenson
Clerk of Superior Court Cobb Cty, Ga.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME: Hendrix Brothers Produce, Inc.

1c. MAILING ADDRESS: 3803 Adabelle Rd | CITY: Register | STATE: GA | POSTAL CODE: 30452 | COUNTRY: USA

1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION: Inc. | 1f. JURISDICTION OF ORGANIZATION: GA | 1g. ORGANIZATIONAL ID #, if any: 07027430 | NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - (blank)

3. SECURED PARTY'S NAME

3a. ORGANIZATION'S NAME: CNH CAPITAL AMERICA LLC

3c. MAILING ADDRESS: 233 LAKE AVE | CITY: RACINE | STATE: WI | POSTAL CODE: 53403 | COUNTRY: USA

4. This FINANCING STATEMENT covers the following collateral:
CROPS: ALL GROWING AND HARVESTED CROPS, ANNUAL AND PERENNIAL CROPS AND OTHER PLANT PRODUCTS, NOW GROWING OR HEREAFTER TO BE PLANTED OR HARVESTED. FARM PRODUCTS: ALL FARM PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ALL SEED, FERTILIZER, FEED, MEDICINES, HARVESTED AND STORED GRAIN, MILK AND OTHER SUPPLIES OR PRODUCTS USED OR PRODUCED IN DEBTOR'S FARMING OPERATIONS. INVENTORY: ALL RAW MATERIALS, WORK IN PROCESS, OR MATERIALS USED OR CONSUMED IN DEBTOR'S BUSINESS. EQUIPMENT: ALL FARM AND BUSINESS EQUIPMENT, WHETHER NOW OWNED OR HEREAFTER ACQUIRED BY DEBTOR, INCLUDING, BUT NOT LIMITED TO, ALL MACHINERY, VEHICLES, AND TOOLS. LIVESTOCK: ALL LIVESTOCK, POULTRY, AND FISH, INCLUDING, BUT NOT LIMITED TO OTHER ANIMALS PRODUCED, USED OR HELD FOR COMMERCIAL OR FARMING PURPOSES, AND UNBORN YOUNG. ACCOUNTS AND DOCUMENTS OF TITLE: INCLUDING, BUT NOT LIMITED TO, ALL ACCOUNTS RECEIVABLE, MILK CONTRACT RIGHTS, AND WAREHOUSE RECEIPTS. COLLATERAL INCLUDES PROCEEDS AND PRODUCTS OF THE PROPERTY LISTED ABOVE.

5. ALTERNATIVE DESIGNATION (if applicable): LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING

8. OPTIONAL FILER REFERENCE DATA

25596131

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

Received Time Apr. 11. 11:36AM